Argued October 11, affirmed November 28, 1956

# BERRY *v.* BLAIR ET AL

303 P. 2d 944

*Warde H. Erwin,* of Portland, argued the cause for appellants. On the brief were Barzee, Leedy, Keane & Erwin, of Portland.

*Thomas H. Tongue, III,* of Portland, argued the cause for respondent. On the brief were Hicks, Davis & Tongue, and W. M. Dale, Jr., of Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY and McALLISTER, Justices.

## BRAND, J.

This is an action for conversion of a truck and trailer. From a judgment below for the plaintiff, defendants appeal.

The original defendants included Boyd J. Blair and Frank Leslie, dba Blair & Leslie, United Finance Co., and Walter Green and Todd Green, dba General Transport Company. There remain as defendants now only Blair and Leslie, an involuntary nonsuit having been entered in favor of the United Finance Co., at the close of the plaintiff's case, and there having been no service on the Greens. We shall refer to Blair & Leslie as "the defendants".

In his complaint plaintiff alleges that he was the conditional vendee of a truck and trailer, that defendants, acting wilfully and maliciously, seized possession of the same and converted them to their own use; that the equipment had a market value of $13,500. The prayer is for this amount in general damages and $10,000 in punitive damages.

The defendants' amended answer denies "each and every material allegation" of the complaint and alleges as a first affirmative defense that the conditional sales contract provided that in the event of default the seller should have the right to retake the vehicle, that possession after default by the purchaser should be unlawful, and that plaintiff was in default and did not, prior to or following repossession, pay or offer to pay the balance due or offer to pay to the defendants "any payment due under said contract." As a second defense defendants allege that at the date of repossession plaintiff was indebted to defendant United Finance Co. in a sum greater than the reasonable market value of the equipment. The answer further alleges

that as a result of the repossession plaintiff's obligation to defendants was canceled, and the prayer is for dismissal of the complaint.

The second amended reply admits that plaintiff was purchaser of the vehicles under a conditional sales contract which was assigned to the United Finance Co., and admits that the contract contained the above-mentioned provision concerning the rights of the seller or his assignee in event of default. The reply denies that plaintiff was in default and denies the other allegations of the first and second affirmative defenses.

For a first affirmative reply it is alleged that on 8 November 1952 defendant promised plaintiff that he would be given up to and including 10 November to complete all payments due to defendants, and that plaintiff had made a promise to make these payments on 10 November, defendants thereby gaining the advantage of securing this promise and the opportunity to escape what would be entailed in enforcing their rights. It is further alleged that plaintiff relied upon this promise and in reliance thereon gave his promise to pay on 10 November, and expended time, trouble, and money in securing arrangements with the bank to make such payments, and also in bringing the vehicles to Portland for repairs; and that before he could carry out the agreement defendants seized the equipment on 10 November; that by virtue of the foregoing, defendants waived any rights they would otherwise have had to repossess the vehicles and are estopped from enforcing such rights, and were not entitled to repossess said vehicle.

A motion was then filed by defendants to strike the first affirmative reply, on the ground that it was sham, frivolous and redundant. The motion was denied,

whereupon defendants filed a demurrer to the first affirmative reply on the ground that it did not state any defense to the new matter pleaded in the answer.

In support of the demurrer defendants contended that there was no valid consideration to support any contract allegedly entered by the parties, and that plaintiff did not allege sufficient facts to show a change of position on which to predicate an estoppel, and that the facts on which plaintiff relied were for the exclusive benefit of the plaintiff and therefore could not be the basis of an estoppel. It is stated in the printed abstract that the demurrer was overruled by the court, but we find no such order in the record here. However, the cause proceeded to trial on 5 November 1953. A verdict was had in favor of the plaintiff and his damages were assessed in the sum of $9,660.45, the element of punitive damages having been removed from the jury's consideration. Judgment was entered accordingly on 12 November 1953.

■ The ultimate question is whether the defendant converted the truck and trailer. In an action of trover for conversion the plaintiff must allege and prove that he had the right to the immediate possession of the property at the time of the alleged conversion. 53 Am Jur 937, Trover and Conversion, § 168; *Austin v. Vanderbilt,* 48 Or 206, 85 P 519; *Hunt v. First National Bank,* 102 Or 398, 202 P 564; *Derby v. Newton,* 142 Or 427, 20 P2d 439; *Cross v. Campbell,* 173 Or 477, 146 P2d 83. The conditional sales contract under which the plaintiff held and claimed the right of possession reads, in part, as follows:

> "Time is of the essence of this contract, and if Purchaser default in complying with any of the terms hereof, Seller, at his option, and without

notice to Purchaser, may declare the whole amount unpaid hereunder immediately due and payable, or Seller may take immediate possession of said property without demand (possession after default being unlawful), including any equipment or accessories thereto; and for this purpose Seller may enter upon the premises where said property may be and remove same. Seller may resell said property, so retaken, at public or private sale, without demand for performance, with or without notice to Purchaser (if given, notice by mail to address below being sufficient), with or without having such property at place of sale, and upon such terms and in such manner as Seller may determine; Seller may bid at any public sale. From the proceeds of any such sale, Seller shall deduct all expenses for retaking, repairing and selling such property, including a reasonable attorney's fee. The balance thereof shall be applied to amount due; in case of deficiency Purchaser shall pay same with interest. Seller may take possession of any other property in above described motor vehicle at time of repossession and hold same temporarily for Purchaser without liability on the part of Seller. Seller shall have the right to enforce one or more remedies hereunder, successively or concurrently.''

The undisputed evidence is that the plaintiff had been in serious default under the contract prior to the time of the taking. In view of the provision of the contract ''possession after default being unlawful'', and of the fact of default in payments, it follows that the plaintiff could not recover unless he established a contract extending the time within which to make payments, or a waiver of the right to take possession under the terms of the contract, or an estoppel barring the exercise of such right. The issues of the case are thus narrowed down to the question as to whether or not the plaintiff was entitled to prevail by reason of the exist-

ence of such contract, such waiver, or estoppel. The issues must be considered in the light of the fact that the plaintiff had a verdict of the jury in the amount of $9,660.45 which is binding upon us if supported by substantial evidence and in the absence of error of law. A determination of these issues requires a consideration of the facts out of which the action arose.

Desiring to go into business, plaintiff, Don Berry, purchased, prior to 21 March 1951, a logging trailer from Pierce Trailer & Equipment Co., giving his personal note for the purchase price of $3,000, both parties having in mind that plaintiff would then purchase a truck, and that he would use the trailer as additional security in that transaction. On 21 March 1951 plaintiff went to the lot of defendants Blair and Leslie for the purpose of purchasing a truck which he knew they had listed for sale, and which was owned by Walter and Todd Green, dba General Transport Co. The plaintiff was without funds with which to purchase the truck which was for sale by the defendants Blair & Leslie, as dealers, but plaintiff owned the trailer for which he had given his note for $3,000. The purchase price of the truck was $10,750. Plaintiff gave Walter and Todd Green a note for $3,750, leaving a balance to be paid of $7,000. This balance was financed as follows: The trailer was, in effect, conveyed to the defendants Blair & Leslie who were to be the conditional vendors of both truck and trailer. The total obligation of plaintiff as purchaser was to be $13,750, represented by the note to the Pierce Trailer & Equipment Co. for $3,000 owing on the trailer purchase, a note to Walter and Todd Green for $3,750 as part payment for the truck, and a balance of $7,000. The $7,000 balance was handled as follows: Defendants Blair & Leslie, as conditional vendors, agreed to sell the truck and trailer

to plaintiff, who was to pay to the defendants $8,423.82 in 18 monthly instalments of $467.99. The total of $8,423.82 represented the $7,000 balance plus interest and carrying charges. The contract acknowledged a down payment of $3,000 which represented the value of the trailer, and which, being included in the contract, stood as additional security. The contract was executed on 21 March 1951 and on the same day was assigned to the United Finance Company. The United Finance Company paid Green and became the owner as vendor of the truck and trailer. In connection with the note for $3,750, plaintiff and Green agreed that he, Green, should have a mortgage on the truck and trailer second only to the United Finance Company contract. An indorsement to that effect was placed upon the note.

Plaintiff knew and understood that defendants had guaranteed payment to United Finance Co., hereafter called "United". Plaintiff paid the stipulated sums from May 1951 to and including October 1951. Immediately prior to November 10, 1952, plaintiff was in default to a substantial amount. The unpaid balance on the contract was $3,839.55, of which $2,339.95 was overdue under the terms of the contract. Plaintiff's note to Green was also in default, as was the note to Pierce Trailer & Equipment Company. While plaintiff was in default United sent repeated demands for payment.

On 13 September 1952 United called plaintiff's attention to the fact that they had received no payment since 5 July, and made the suggestion that the plaintiff seek his financing elsewhere. One payment only was made thereafter, in the sum of $467.99. Demands were made upon plaintiff for payments on the 13th and 23d of October. On 5 November, while plaintiff was still in default, United executed an instrument au-

thorizing Walter Green "to act for us  *  *  *  to collect all past due payments, or in his discretion to take possession of the collateral in our behalf." The total delinquency was stated to be $2,339.95. Armed with this authority, Green saw the plaintiff in Pendleton on Friday, November 7, and exhibited to the plaintiff his written authority. Plaintiff testified as follows:

"Q  And what happened?

"A  After talking to Mr. Green, we reached an agreement whereby I was to come to Portland and try and make arrangements for other finances and in that manner pay off this obligation to United Finance.

"Q  And you say because of that that you didn't make another payment?
"A  That is correct."

Plaintiff told Green that he would come to Portland on Saturday, November 8 to seek further financing, and asked whether that arrangement was agreeable with Green. According to the plaintiff, Green's answer was, "Yes, I am going on to Baker to my sister's. I will be back here some time Sunday, and I will see how you made out in Portland."

On rebuttal plaintiff was again asked concerning his conversation with Green. Plaintiff replied, "The only arrangements that were made was that if I failed in my effort to refinance why then he could take the truck and do whatever he liked with it." Plaintiff testified that he was at that time ready to make another payment and that the check was actually drawn but that he withheld it because of the conversation with Green.

Green testified that the plaintiff agreed to bring the equipment to Portland and to put it on the defend-

ant Blair's lot, but the plaintiff denied making such an agreement. Early on Saturday, November 8, the plaintiff went to Portland. He testified:

"A  Well, I went over to the Pierce Trailer & Equipment Company, told them my troubles, and by working with them and the First National Bank, I made arrangements to refinance.

"Q  Now, when you say refinance, what do you mean?

"A  Well, that the First National was to pay off United Finance, and that from there on I was to make my payments to the First National Bank."

On Saturday plaintiff called Mr. McCroskey, the manager of United, by phone. Plaintiff testified:

"Q  And what was that conversation?

"A  Well, I told him that I had arrangements made for refinancing and that I would be up and pay the balance due if he would assign the contract to the First National Bank.

"Q  You told him you had made arrangements for refinancing it?

"A  Yes.

"Q  Did you tell him with whom?

"A  I believe I did, yes.

"Q  And when did you say that you would be in?

"A  Right at that conversation, I don't believe I did. I said that I would be in, yes.

"Q  What did he reply?

"A  That was agreeable with him. That what they wanted was the money.

"Q  Did you say any particular time that you would be in?

"A  On the first conversation, no, I didn't.

"Q  You didn't say whether you would be in that day or any other day, is that right?

"A  Yes, it was understood that I was to be in that day, Saturday.

"Q Saturday, November 8?

"A Yes.

"Q And Mr. McCroskey said that was agreeable with him?

"A Yes."

Plaintiff was informed on Saturday that Pierce Trailer & Equipment Company and the bank had decided that they wanted to check the title for liens or mortgages, which could not be done until Monday, so the plaintiff called McCroskey and told him that he would be in on Monday "to make the pay-off" instead of Saturday, if that was agreeable with him, and that McCroskey said "that was all right with him." Plaintiff also testified:

"Q You had advised them, as I understand it, or it was agreed with Mr. McCroskey that you would pay them on Monday?

"A That I would definitely be in on Monday.

"Q Arrangements with the bank had been made to get that money?

"A Yes."

Plaintiff did not make any personal contact with the bank for financing until Monday morning and did not go to the bank at all until after the truck had been repossessed. However, Mr. Wachsmuth, credit manager for Pierce Trailer & Equipment Company, hereafter called "Pierce Trailer", testified that on the morning of Saturday, November 8, the plaintiff called him at his home and stated that he was about to lose his equipment. Wachsmuth then called Mr. Ross of the First National Bank and told him that Pierce Trailer was willing to refinance the truck and trailer for the plaintiff and asked Ross to call United and tell them "that we would pay them off." He testified that the bank agreed to do it and would take the papers. It

was understood that if there were any existing liens an assignment would be necessary, which would keep Pierce Trailer "in first place." The contemplated deal was that the bank should give a cashier's check to United for the pay-off and charge Pierce's account. Mr. Ross of the bank testified concerning his conversation with Wachsmuth on Saturday, as follows:

"A Well, Mr. Wachsmuth asked me to call the United Finance Company and obtain a pay-off. And that he, in turn, would give me the check and I was to issue a cashier's check payable to United Finance, and he, at the same time, would give me an authorization for pay-off signed by Mr. Berry.

"I told him that I would go ahead and do that.

"Q Were those arrangements satisfactory with the bank?

"A Absolutely."

Mr. Wachsmuth testified:

"Q Would I be correct, Mr. Wachsmuth, in saying that the bank would be looking to the credit of the Pierce Trailer, rather than to the credit of Don Berry, in its purchase of the paper?

"A That's right.

\* \* \* \* \*

"Q Would it be necessary that you sign papers at the bank before that check would have been issued?

"A No.

"Q You mean the bank would have just sent the check up?

"A I told you they would have sent the check up there and charged it to our account until we took the mortgage up there."

Mr. Ross testified that he never issued a cashier's check payable to United, but was ready, willing and able to do so at any time it was called for, and that he called United shortly after his Saturday conversa-

tion with Wachsmuth and was told the unpaid balance on the plaintiff Berry's contract. Ross said that it was not necessary for Mr. Berry to sign any formal document with the bank. Obviously he was relying upon the credit of Pierce Trailer and not upon that of plaintiff. The bank financed contracts of the same character for Pierce Trailer "all the time." Ross also testified that Pierce Trailer maintained an account at the bank "sufficient to take care of that many times over."

Plaintiff went to Pierce Trailer on Monday, November 10, where he had left the equipment, and found it gone. On that day he signed a power of attorney authorizing Wachsmuth of Pierce Trailer to pay off United.

When plaintiff discovered that the truck had been repossessed he called McCroskey of United on the phone and advised him that he was on his way up to pay off that contract. McCroskey then advised plaintiff that it had already been paid off by Blair. We quote from the testimony: "And then I asked him if it wasn't our agreement, that I understood that I had until Monday to pay it off myself. He said that was true." Again, we quote:

"* * * Now, Mr. McCroskey told you that was true, in answer to your question about there had been an agreement for you to pay off this money?

"A Yes. He also stated that a contract is a negotiable paper and that it is for sale or could be for sale or could be sold, and that Mr. Blair had come in with the money, so he sold the contract to him.

"Q Was that the extent of the conversation?

"A Well, other than I asked him if there was no way I could pay it off now, and he said 'No,' that it had been paid off.

"Q What did you do then?

"A Well, some time after then, I don't know just how long, I went over to Blair's office, Blair & Leslie's office, and asked them if I could pay the truck off to them.

"Q Now, when you say them, who do you mean?

"A Blair and Leslie.

"Q Were they both present when you were there?

"A Yes, they were.

"Q What happened when you were there?

"A They weren't interested in selling any contract, either.

"Q You, at that time, offered to pay off the contract, did you?

"A Yes, I did.

"Q They refused?

"A That is correct."

Green, who was the original seller of the truck, testified that he had about $3,000 involved, referring to the balance on the note for $3,750 signed by the plaintiff. On Monday Green borrowed $3,900 to pick up the contract on the equipment (the balance owing by plaintiff being $3,839.55) and got a cashier's check from the First National Bank and took it to United. He arrived there at about 3:30 p. m., paid off the contract and took the equipment. When United Finance was paid off on Monday they assigned the contract to Blair who, on the same day, assigned it to Green. Green thereafter spent a considerable sum in the payment of a lien for tires purchased by the plaintiff, and an additional sum to put the equipment in condition for sale. The equipment was sold by Green in October or November 1953.

Another witness, W. Dale, testified that he was in Blair's office in the morning of Monday, November 10, and that Blair made a telephone call to his partner, Leslie, and told Leslie to come down. "He said he had to get right down to the office because they had to get a check over to the finance company before Don Berry got in, which he figured was noon that he would be in." The same witness testified that he heard Blair call a finance company and ask if Don Berry had picked up his contract. Blair then said that they would be over to pick it up. Thereafter Mr. Leslie arrived and a check was passed from Mr. Leslie to Mr. Blair. This occurred on Monday between 10:30 and 11 o'clock a. m. The truck was repossessed at about 11:30.

United repeatedly indicated that all they desired was to be paid, but there is substantial evidence that this was not the attitude of Blair and Leslie, or of Green. It definitely appears that on Monday Blair and Green, on one side, were engaged in a race against the plaintiff and Pierce Trailer on the other, to see which could first make the pay-off and seize the property. It is also clear that, notwithstanding McCroskey's statement that United had already been paid off by Blair, the actual payment was not made until about 3:30 p. m. of that same day.

■■ There are only four assignments of error and they have been consolidated for the purpose of argument in defendants' brief. They are (1) the failure to grant a nonsuit; (2) the failure to sustain a demurrer to plaintiff's first affirmative reply; (3) the failure to direct a verdict for the defendants; and (4) the failure to award judgment to the defendants n.o.v. Before discussing the motion for nonsuit we will consider the motion for directed verdict because, in our opinion, there was some evidence presented by the defendants

which tended to support the testimony of the plaintiff. McCroskey stated that he had telephone calls from Berry on Saturday the 8th and on Monday the 10th of November and that Berry said he thought he could "take care of this thing Monday." McCroskey testified that he called Blair by phone on the morning of November 10th and Blair then agreed to purchase the contract from United. McCroskey claimed that by this conversation he sold the contract to Blair. McCroskey placed an assignment stamp on the contract which recited an assignment to Blair and which was signed, United Finance by McCroskey. However, the assignment was not then delivered to Blair. After making out the assignment, McCroskey put the documents in his desk to await the time when Blair would come after them. At about 3:30 p. m. on Monday Green and Blair came to the office of United and another assignment was placed upon the contract, whereby Blair & Leslie assigned to Green. McCroskey said he probably called Blair on Saturday after being told by the plaintiff that he, the plaintiff, would be in on Monday. McCroskey also called Blair on Monday morning and gave him the "pay-off" figure. The defendants complain that "a judgment was entered against them for the full value of the truck as claimed by plaintiff in his complaint less the balance due on the contract, although Blair was purely an agent for the Greens." They overlook the fact that if the plaintiff was entitled to the possession of the equipment at the time of its seizure, then the person taking the wrongful possession would be liable whether or not he was merely an agent. But Blair was not merely an agent of Green. The defendants were active participants with Green in the transaction and, in part at least, were acting in their own interests. It will be remembered that the defendants were guar-

antors of United on the contract. The authority given to Green on 5 November to repossess the equipment was done at the instance of Blair. McCroskey admitted that the plaintiff called him between 11 and 11:30 on Monday morning after he claimed he had sold the contract to Blair by verbal conversation and before the actual payment was made in the afternoon. It was Blair who suggested to Green that he wait to see if the plaintiff was going to be able to pay off the contract and if not, "it was a possible chance" that Green could pick up the contract and salvage the money he had on the note.

It is conceded that the original contract was binding upon the plaintiff when made, but it is necessary to consider the terms of that contract. United, as assignee of Blair, was given the right, in event of default, to declare the whole amount due and payable, or to take possession and resell the equipment at private sale. There was no provision for an automatic forfeiture on repossession, and we find no evidence that the right on the part of the vendor to declare all instalments due and payable was ever exercised. The alleged agreement by United to extend the time within which plaintiff might pay off the entire contract cannot be construed as a declaration by the vendor accelerating the payment of the entire obligation. The only remedy involved was the retaking of possession which carried with it the right of private sale of the property. We hold that the jury could find from the evidence that the plaintiff undertook to make the pay-off of the total unpaid balance and that he was to have to and including Monday in which to do it. They could also find that United agreed to this arrangement and that the defendants Blair & Leslie were aware that plaintiff was going to refinance the deal on Monday. Not

only is there evidence of a promise by plaintiff which went beyond the contractual obligations, but we think the jury was also warranted in inferring from the evidence that the understanding was that there would be no repossession of the equipment unless and until the plaintiff failed to make the pay-off on Monday.

In *Endicott v. Digerness,* 103 Or 555, 568, 205 P 975, this court said:

"No general rule in regard to a waiver by such a seller can be laid down, other than that a waiver may be inferred whenever the conduct of the conditional vendor is inconsistent with the idea that he still expects to enforce a return of the goods if the conditions are not performed. Whether such is the case or not is a question of fact: * * *"

The facts of this case bear a striking resemblance to those in *Samuels v. Mack-International Etc. Corp.,* 128 Or 600, 275 P 596. In that case this court said:

"In the light of the above record, we think there was evidence tending to show a waiver of strict performance of the contracts as to payments. Waiver cannot be predicated on the acceptance of some of these monthly installments a few days after the due date, but unquestionably the indulgence shown by defendant, in giving plaintiff an opportunity to refinance the purchase of the trucks, would warrant the jury in inferring that it was not the intention of the defendant to declare a forfeiture if plaintiff would comply with his contract. * * *"

The difference between the two cases lies in the fact that after the defendant had waived his right to declare a forfeiture he took steps to reinstate such right. No such steps were taken in the pending case. See also *Mathers v. Wentworth & Irwin, Inc.,* 145 Or 668, 26 P2d 1088, 29 P2d 516; *Cross v. Campbell,* 173 Or 477, 146 P2d 83; *Geroy v. Upper* and *Knight v.*

*Barry,* 182 Or 535, 187 P2d 662; *Smith v. Carleton,* 185 Or 672, 205 P2d 160; 78 CJS 339, Sales, § 594.

We find no fatal inconsistency between plaintiff's claim that there was a contract supported by consideration whereby the plaintiff agreed to pay off the entire obligation and United agreed to refrain from repossession on Monday November 10, and the claim of the plaintiff that United waived the right to repossess on that day. If in fact the court overruled the demurrer to the plaintiff's first affirmative reply (which does not appear in the record before us), we hold that no error was committed, the reply being sufficient after verdict.

In defendants' motions for nonsuit and directed verdict no mention was made of any failure of proof or pleading of a waiver. Both motions were properly denied. See *Edvalson v. Swick,* 190 Or 473, 227 P2d 183. We need not determine whether the plaintiff established a case of estoppel, for under the authorities we find sufficient evidence of an intent to waive the right of repossession on the part of United. If, as the jury found, the original repossession constituted a conversion, it would be unnecessary to consider whether the plaintiff thereafter made a proper tender, or whether, under the evidence, such a tender would have been futile.

Finally, the trial court instructed the jury that when United assigned the contract to Blair & Leslie, the assignees became subject to all of the duties of United and stood in its shoes. No assignment of error is made concerning this instruction and we decline to consider it.

Finding no prejudicial error in the record, the judgment for the plaintiff is affirmed.